**SIGNED this 26th day of January, 2011.**

LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE

_____

# United States Bankruptcy Court

### Western District of Texas
### San Antonio Division

| | |
|---|---|
| In re | Bankr. Case No. |
| Alfred L. Fernandez | 09-32896 |
| *Debtor* | Chapter 7 |

## Memorandum Decision on Objection to Exemption

The chapter 7 trustee in this case, Marshall Miller, objected to the debtor's claim of a homestead exemption. As of the filing date, the debtor resides in Texas. His address is 11685 Bunky Henry, El Paso, Texas. However, the debtor used to live in Nevada. The debtor relocated to Texas approximately one year before this bankruptcy filing. In his original schedules, he claimed his Texas home as exempt pursuant to the Texas homestead laws. The trustee objected, stating that the debtor was not eligible to claim the Texas homestead, by virtue of the provisions of section 522(b)(3) of the Bankruptcy Code. The debtor then amended his Schedule C, and claimed the selfsame home as exempt under Nevada's homestead laws. The trustee once again objected,

now noting that the debtor could not use the Nevada homestead laws to claim a state law exemption in a home that was located in a state other than Nevada. The debtor responded that, under the authority of a decision by another judge of this court,[1] the Nevada statute could, at least in the context of the federal exemption scheme, have extraterritorial application. In other words, says the debtor, unless Nevada law itself would prohibit it,[2] a debtor can use the Nevada homestead exemption to claim a homestead exemption under section 522(b)(3), even though the home located not in Nevada, but in Texas.

The parties do not dispute the base facts. The debtor owns a home in El Paso, Texas, located at 11685 Bunky Henry. The debtor purchased the home some years ago and lived there. He was laid off from his job and was forced to relocate to Nevada for work. However, he never sold his Texas home, and always intended to keep it as his homestead, and never intended to abandon it. He kept up the payments on the home for the entire time he was in Nevada (about 7 years). Eventually, he was able to move back to Texas, about a year before this bankruptcy filing, and he once again took up residence in his home in El Paso. He filed this bankruptcy case the last day of 2009.

---

[1] *See In re Camp*, 396 B.R. 194, 201-203 (Bankr. W.D. Tex. 2008) (Gargotta, B.J.). The *Camp* decision was recently reversed by the Fifth Circuit, though on on different grounds. *See Camp v. Ingalls (Matter of Camp)*, --- F.3d ---, No. 09-50852 (5th Cir. Jan. 21, 2011). The Fifth Circuit reversed *Camp*'s ruling that Florida's "opt-out" ruling applied to persons not residents of Florida, despite the language in the statute expressly stating that it applied to residents of Florida, on plain meaning grounds. *Id.*; *see also In re Battle*, 366 B.R. 635, 636 (Bankr. W.D.Tex. 2006) (same). The circuit stated that, because of its ruling on this issue, it did not reach the corollary issues regarding whether section 522(b)(3)(A) pre-empted state law restrictions on extraterritorial application of a state's exemption law and whether the savings clause at the conclusion of section 522(b)(3) permitted debtors to claim federal exemptions when the applicable state both enacted an opt-out law and prohibited the extraterritorial application of the state's exemptions. These are issues that are reached in this opinion and so are not resolved by the Fifth Circuit in *Camp*.

[2] The debtor could have argued, under *Camp*, that the debtor could use Nevada's exemption to claim property in Texas even if the Nevada exemption statute *expressly* limited its reach to property in Nevada. *See id.*

## Analysis

Section 522(b) permits an individual debtor who files for bankruptcy to claim certain property as exempt. The effect of the claim of exemption is that such property, if exempted, "is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of [title 11] as if such debt had arisen, before the commencement of the case ..." 11 U.S.C. § 522(c). The effect is important, because it serves a uniquely federal purpose. The property claimed as exempt cannot be administered by the trustee (once the exemption determination becomes final) and *pre-petition* creditors (other than creditors with *in rem* rights that otherwise survive the bankruptcy process) cannot enforce their claims against the property. The determination of exemption for bankruptcy purposes would *not* be binding *vis-à-vis* a post-bankruptcy creditor seeking to enforce its claim against that selfsame property however. Such a creditor would only be barred from collection action against that property if it would also be exempt under applicable *non*-bankruptcy law. *See Davis v. Davis (In re Davis)*, 170 F.3d 475, 479 (5th Cir. 1999) ("§ 522(c) sought to leave exempt property exposed to post-bankruptcy liability only to the extent it would have been exposed if the bankruptcy had not occurred. This interpretation is the most plausible reading of § 522(c)").[3]

---

[3] As explained later in this opinion, the fact that the exemption section serves a federal purpose does not mean that state exemptions which debtors are authorized to claim in section 522 are thereby *federalized* and converted into a bastardized federal exemption, as *Camp* and others argue. *See* discussion *infra*. That, in this court's opinion, is "a bridge too far." *See* Cornelius Ryan, *A Bridge Too Far*, at p. 67 (Simon & Schuster 1974) (The book title comes from the comment made by British Lt. Gen. Frederick Browning, deputy commander of the First Allied Airborne Army, to Field Marshal Montgomery before Operation Market Garden, the Allied effort in World War II to take out numerous bridges in a failed attempt to break through the German lines in the Netherlands in September 1944. "I think we may be going a bridge too far," he said.)

To implement this function, section 522(b) gives the debtor the option to select either the federal exemption scheme set out in section 522(d), or the state exemption scheme applicable to the debtor, as determined by the domiciliary provisions of section 522(b)(3)(A).[4] However, the debtor's option in section 522(b)(1) is limited by section 522(b)(2), which says that the debtor will *not* have the right to choose federal exemptions if applicable state law, as determined under the same domiciliary rule in section 522(b)(3)(A), prohibits that choice. *See* 11 U.S.C. §§ 522(b)(2), (b)(3)(A). Many states have "opted out" pursuant to this section, including Nevada. *See* NEV. REV. STAT. ANN. § 21.090(3) (2010). Texas is one of a minority of states that permits debtors the choice provided in section 522(b)(1).

The domiciliary rule, applied to the facts of this case, says that "the place" is Nevada. The debtor lived in more than one state within the 730-day period preceding this bankruptcy filing, and for the greater portion of the 180 day period preceding the 730 day period, the debtor was living in Nevada. As Nevada is an opt-out state, this debtor is not permitted to choose the federal exemptions, unless as a result of the domiciliary rule, the debtor is left with no exemptions to claim.  *See* 11 U.S.C. § 522(b)(3) (savings clause appended after the final lettered subparagraph).[5] Even if this debtor *could* use the federal exemptions, however, they would do this debtor little good,

---

[4] The domiciliary rule will be discussed in greater detail later in this opinion, but for ease of reference, here is how it reads, in applicable part: "… the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition or if the debtor's domicile has not been located at a single State for such 730-day period, the place in which the debtor's domicile was located for 180 days immediately preceding the 730-day period or for a longer portion of such 180-day period than in any other place." 11 U.S.C. § 522(b)(3)(A).
[5] Even if this debtor *can* use the federal exemptions (and we shall see later in this opinion that he can), they would do this debtor little good, as the dollar amount of the federal exemption for a residence is too little to shelter the debtor's equity in his home in El Paso (according to his schedules).

as the debtor is trying to claim his home as exempt. According to his schedules, his home is worth $103,195.00, with a secured claim of only $32,000. As a single debtor, the maximum available exemption for his residence is $20,200 (as of the filing date). *See* 11 U.S.C. § 522(d)(1) (eff. Apr. 1, 2007). Thus, the debtor is limited to the Nevada homestead exemption law for picking a homestead, both as a matter of law and as a matter of practicality. The debtor does not have a home in Nevada, however. The debtor's home is in El Paso, Texas. Thus, the question is squarely presented: can this debtor use the Nevada homestead exemption law to claim his home in El Paso, Texas as exempt, for purposes of section 522?

Nevada gives a debtor a homestead claim of up to $550,000 of equity in property consisting of "a quantity of land, together with the dwelling house thereon and its appurtenances." NEV. REV. STAT. ANN. § 115.005, 115.010 (2010). By its express terms, the exemption is not self-limited to property located within the state of Nevada. However, the Nevada Supreme Court, called upon to answer a certified question regarding Nevada's homestead law, noted in passing that "the purpose of the homestead exemption is to preserve the family home despite financial distress, insolvency or calamitous circumstances, and to strengthen family security and stability for the benefit of the family, its individual members, *and the community and state in which the family resides.*" *Jackman v. Nance*, 109 Nev. 716, 718, 857 P.2d 7 (1993) (citing to a Colorado state court decision). In other words, the policy behind the exemption is uniquely related to the interests of the state of Nevada. Nevada may have sympathy for debtors who once lived in Nevada, but its exemption laws are designed to

5

serve the needs and interests of the people of Nevada. Former residents are no longer part of the group of persons for whose benefit Nevada enacts its laws.

The *Jackman v. Nance* case referred to an early decision, *Smith v. Stewart,* 13 Nev. 65 (1878), construing Nevada's then-new homestead law. *Id.* The court in *Smith* explained that the exemption was designed to shelter Nevada residents from execution in Nevada -- and explained the mechanism of a claimant designating that home as a homestead by notifying an officer attempting to make a levy at the time of the levy. 13 Nev. at 70. The practical effect of the exemption, then, was to shelter it from execution *in Nevada*, and any dispute over the homestead would, under Nevada law, arise in the context of a levying creditor attempting to execute pursuant to the laws of the state of Nevada. If the levying creditor were conducting the levy in another state (say Texas), then the issue would not even arise in a Nevada court. Even though the Nevada homestead does not expressly say that its reach is limited to property in Nevada, it is as a practical matter so limited, because Nevada's homestead exemption is only relevant in the context of levies conducted by creditors in Nevada, pursuant to Nevada's collection laws.

This conclusion is consistent with a larger observation regarding exemption statutes. State exemption laws do not have extraterritorial effect. Exemption laws are rooted in a state's internal interests in balancing the competing needs of creditors who count on the state law remedies available for collecting on judgments and of debtors who need a fresh start even in the depths of financial adversity.[6] Those underlying

---

[6] A state's interest in enacting exemption laws flows directly from its interest in preserving a minimum amount of property for every debtor, regardless of their level of indebtedness, so that they do not end up

policy interests, of course, stop at a given state's borders. It is thus not surprising that the vast majority of courts have ruled that a given state's exemption laws have no extraterritorial application. *See* Laura B. Bartell, *The Peripatetic Debtor: Choice of Law and Choice of Exemptions,* 22 EMORY BANKR. DEV. J. 401, 416 & n. 103 ("Bartell").[7]

It is, of course true that, under the Constitution, states are expected to accord comity to the judgments of other states. *See* U.S. CONST. ART. IV, § 1; *see also* 28 U.S.C. § 1738.[8] State courts are also expected to give to the Acts of the legislature of another state "the same full faith and credit … as they have by law or usage in the courts of [the] State … from which they are taken." 28 U.S.C. § 1738. But that is a far

---

becoming a burden on the state, and so that they may preserve a modicum of dignity even in the depths of financial straits. *See, e.g., In re Leva,* 96 B.R. 723, 727 (Bankr. W.D. Tex. 1989) (discussing Texas' exemption policy).[6] In *Cobbs v. Coleman*, the Texas Supreme Court colorfully stated the purpose thusly:

> No Creditor shall strip from the sacred body of the wife of your bosom, from the tender form of the precious child she bore you, or from your own frame, the clothing you have purchased with your earnings to hide your nakedness and that of your beloved dependents. This unnecessary humiliation shall never be visited upon you, with the consent of the law.

14 Tex. 594 (1855); *see also* William Houston Brown, *Political and Ethical Considerations of Exemption Limitations: The "Opt-Out" as Child of the First and Parent of the Second,* 71 AM. BANKR. L.J. 149, 163-64 (Spring 1997) (discussing similar purposes expressed in the exemption schemes found n many states).
[7] In her footnote, Bartell cites the following cases as examples: *DeLotel v. DeLotel (In re Marriage of DeLotel)*, 140 Cal. Rptr. 553, 555 (Cal. Ct. App. 1977); *Garrett v. Garrett*, 490 P.2d 313, 315 (Colo. Ct. App. 1971); *Mahl v. Aaron*, 809 N.E.2d 953, 957 (Ind. Ct. App. 2004); *Ferneau v. Armour & Co.*, 303 S.W.2d 161, 167 (Mo. Ct. App. 1957); *Goodwin v. Claytor*, 49 S.E. 173, 174 (N.C. 1904); *State ex rel. Lankford v. Collins*, 174 P. 568, 570 (Okla. 1918); *Carson v. Memphis & C.R. Co.*, 13 S.W. 588, 589 (Tenn. 1890); *Bergman v. Bergman*, 888 S.W.2d 580, 582 (Tex. App. 1994); *Strawn Mercantile Co. v. First Nat'l Bank of Strawn*, 279 S.W. 473, 474 (Tex. App. 1925); *Wm. Cameron & Co. v. Abbott*, 258 S.W. 562, 564 (Tex. App. 1924); *S. Pac. Co. v. I.X.L. Furniture & Carpet Installment House*, 140 P. 665, 666 (Utah 1914).
[8] The Constitutional provision states that "full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. CONST., ART. IV, § 1. The Full Faith and Credit Act, in its current form, directs how the "Acts of the legislature of any State, Territory or Possession of the United States … shall be authenticated …" and then states "Such Acts … so authenticated … *shall have the same full faith and credit in every court within the United States … as they have by law or usage in the courts of such State ,…from which they are taken."* 28 U.S.C. § 1738.

cry from the assertion that one state can *require* another state to apply the first state's laws, which is what "extraterritorial effect" must mean, if it is to mean anything at all.

Even if we were to construe "extraterritorial effect" as another way of stating that states are expected to give full faith and credit to one another's enactments, however, the contention would face another roadblock. The Supreme Court has said, with respect to legislative enactments, that a state is not required to "substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Franchise Tax Board v. Hyatt*, 538 U.S. 488, 494 (2003) (declining to find that the tort laws of one state had to be given full faith and credit in another state); *Sun Oil Co. v. Wortman*, 486 U.S. 717, 722 (1988) (one state did not have to apply another state's statute of limitations rule to a given action otherwise governed by the substantive law of the other state). Nor is a given state court obligated to adopt the enforcement mechanisms of another state. *Baker v. General Motors Corp.*, 522 U.S. 222, 235 (1998). The states, as sovereigns, are not *required* in such circumstances to apply the law of a sister state under principles of full faith and credit. *Hyatt*, 538 U.S., at 498.[9] It is thus a hard case to make that this voluntary extension of comity on the part of a receiving state translates to extraterritorial effect with respect to the law of an enacting state. The fact that one state may *choose* to enforce another state's laws within its own borders says nothing about whether one state can *require* another state to enforce its laws within the other state's borders.

---

[9] The Court also, however, declined to lay out any "guiding standards of a legal character" for determining what choice of law in a given circumstance is required by the Constitution. Id., at 496 (quoting Justice Robert H. Jackson, *Full Faith and Credit – The Lawyer's Clause of the Constitution*, 45 COLUMB. L.REV.1, 16 (1945)).

There is a further roadblock. Were one to maintain that the recommendation to "be nice" is the equal of "extraterritorial effect," one would face the further line of authority from the Supreme Court generally denominated as "the enforcement exception" to the Full Faith and Credit Clause. Thus, while a state is obligated to give full faith and credit to a judgment for purposes of issue or claim preclusion, it is *not* required to *enforce* that judgment as it would be enforced in the originating state. Instead, execution of judgments is governed by the law of the forum state. *McElmoyle v. Cohen*, 38 U.S. (13 Pet.) 312, 324-24 (1839); *Olmsted v. Olmsted*, 216 U.S. 386, 394 (1910) (full faith and credit obligation does not extend the jurisdiction of the courts of one State to property situated in another, but only makes the judgment conclusive on its merits – it can only be executed in the latter state as *its laws* permit); *see also* Restatement (Second) of Conflict of Laws §§ 102-103 & cmt. B (1971) ("a state can deny full faith and credit when recognition of a sister State judgment would require too large a sacrifice by a State of its interests in a matter with which it is primarily concerned").

The enforcement exception, whether denominated as such or not, has arisen in numerous jurisdictions. An Indiana court considered the question whether a debtor against whom a judgment was taken in California could assert Indiana's exemption for an IRA owned by the debtor and located in Indiana, when the debtor herself was domiciled in South Carolina. *Mahl v. Aaron*, 809 N.E.2d 953 (3rd Ct.App. – 2004). Said the court, "when determining whether personal property is *subject to execution*, Indiana law looks to the law of the state in which the property was located at the time the debt

arose." *Id.,* at 957. The court further explained that, for Indiana's purposes, the debt "arose" when it was domesticated *in Indiana*. Indiana's own exemption statute required as a prerequisite that the person claiming the exemption be a resident of Indiana. This debtor was not.

The Indiana court cited to an earlier California decision, *DeLotel v. DeLotel*, 73 Cal.App.3d 21, 140 Cal,Rptr. 553 (1977). In that case, a writ was issued to trap the proceeds payable to the judgment debtor from a pension fund in California. The defendant debtor was then resident in Oregon. When the debtor argued that the California court ought to apply Oregon's exemption for pensions, the court said that "exemption laws pertain merely to the remedy and have no extra-territorial effect, and exemption laws of the forum apply." That court also noted that "no rule of comity requires recognition of a foreign exemption law." *Id.*, at 24;[10] *see also Pinson v. Murphy*, 220 Ky. 464 (1927) (exemption statutes pertain to and are part of the remedy associated with a judgment, and in matters relating to the remedy, the law of the forum

---

[10] For the proposition that no rule of comity requires recognition of a foreign exemption law, *see Baumgardner v. Southern Pac. Co.*, 177 S.W.2d 317 (Tex.Civ.App. – El Paso, 1943); *see also Strawn Mercantile Co. v. First Nat. Bank*, 279 S.W. 473 (Tex.Civ.App. – 1925) (generally held that the rule of comity extends to rights only and does not generally extend to remedies). In *Baumgardner*, the Texas Court of Appeal for El Paso said that Texas' exemption for wage garnishment only applied were the garnishment initiated in Texas. Where the garnishment was initiated in Arizona, Texas could not export its exemption to prevent Arizona's enforcement action, exemption laws being local in nature and having no extraterritorial effect or operation. And Arizona was not obligated to accord comity to Texas' exemption statute with regard to its enforcement action in Arizona, even though the debtor was clearly resident in Texas.

The case law does recognize that comity may be extended with respect to the exemption laws of another state where the exemption laws of both states are practically the same, and where the party seeking it would be entitled thereo under the laws of either state." *See, e.g., Pierce v. C. & N. W. Ry. Co.*, 36 Wis. 283*; Mo. Pac. Ry. Co. v. Maltby*, 34 Kan. 125, 8 P. 235*; Kansas City, etc., Ry. Co. v. Gough,* 35 Kan. 1, 10 P. 89*; K. C., F. S. & M. Ry. Co. v. Cunningham*, 7 Kan. App. 47, 51 P. 972*; Schroeder, etc., Co. v. Willis Coal Co.,* 179 Mo. App. 93, 161 S.W. 352*; Mason v. Beebee*, 44 F. 556 (Circuit Court, S.D. Iowa 1890).

is applied to the exclusion of the law of the jurisdiction where the cause of action arose).[11]

In *Sherwin-Williams Co. v. Morris*, 25 Tenn.App. 272, 156 S.W.2d 350 (1941), a Tennessee court observed that "the law of the forum determines matters *pertaining to the execution of judgment*, what property is exempt *from execution*" and such. Thus, the clear and sensible connection was made between execution and exemptions, the latter having meaning and significance (as a matter of state law) only in the context of their use as a bar to execution enforcement on certain types of property. *Id.*; *see also Foley v. Equitable Life Assurance Society,* 19 N.Y.S.2d 502, 504-05 (1940) (noting that neither New York nor Pennsylvania law would give extraterritorial effect to Pennsylvania's exemption law, and that exemption laws are related to the remedy for the collection of debts and so are subject to the law of the forum).

The point to be made then, from a review of these cases, is that exemption laws are part and parcel of the larger remedial scheme of a given state's mechanisms for the enforcement of judgments. Such laws do not have extraterritorial effect for the obvious reason that one state cannot impose its remedial scheme on another state.[12] Nor does full faith and credit require one state to defer to another state's exemption scheme, given that such schemes are part of the respective states' larger enforcement

---

[11] In *Pinson*, it was anticipated that the exemption laws of West Virginia ought to be applied, that being the forum whose substantive law applied to the cause of action. The exemption laws to be applied were held to be those where the debt was being collected, and where the property sought to be appropriated was located, the court citing to numerous earlier authorities. *Id.*

[12] And this in turn means that it is unnecessary (perhaps even misleading) to examine whether a given state's exemption law is *intended* to apply extraterritorially, or whether a given state's law is silent with regard to its extraterritorial application. Courts that go down this road are on a snipe hunt, because the question itself is irrelevant.

mechanisms.[13] One state is certainly *free* to apply another state's exemption laws to an enforcement action, under principles of comity, but it is by no means *required* to do so. And because comity is a matter of discretion on the part of a given state, a federal court has an obligation to apply it in the context of the application of one state's exemptions to property located in another state in a manner consistent with how that state would do so, under *Erie. See Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 79-80 (1938).

The domiciliary test in the current version of the Bankruptcy Code creates odd consequences, in light of the foregoing analysis. After all, it imposes, for some mobile debtors, a legal regime relating to exemptions that is at odds with the fundamental nature of the exemption scheme itself. The facts of this case provide a paradigmatic example of the problem. The venue rule places this debtor's bankruptcy case in Texas. *See* 28 U.S.C. § 1408(1) (venue in the domicile or residence of a debtor for the greater portion of the 180 day period prior to filing). The domiciliary rule for exemptions forces the debtor to use Nevada's exemptions. *See* 11 U.S.C. § 522(b)(3)(A) (the place where this debtor, who moved to Texas within the two year period prior to filing, lived for the greater portion of the 180 day period immediately preceding the 730 day period prior to filing, *i.e.*, Nevada). If state exemptions are to be applied in bankruptcy consistent with the way they would be applied outside bankruptcy, then mobile debtors such as the debtor here will find themselves saddled with a set of exemptions that they cannot use. Nevada's exemptions will do this Texas debtor very little good.

It would be great were the court to conclude that it could simply ignore the state law roots of the state law exemption scheme imposed on this debtor. That is certainly

---

[13] *Baker v. General Motors Corp.*, 522 U.S. 222, 235 (1998).

the course plotted by the courts in *Camp* and *Garrett*. *See In re Camp*, 396 B.R. 194, 201-03 (Bankr. W.D.Tex. 2008), *rev'd on other grounds*, --- F.3d --- (5th Cir. Jan. 21, 2011); *In re Garrett*, 435 B.R. 434, 439 (Bankr. S.D.Tex. 2010); *see also* Bartell, *supra* at 417-19. Unfortunately, it is not so easy to pry the Bankruptcy Code's use of state law exemption schemes from their moorings. A brief review of how such schemes made their way into a federal bankruptcy statute demonstrates why this is the case.

Exemptions in bankruptcy after 1898 and prior to 1978 were exclusively a state law question. That, in turn, was a reflection of what one commentator has described as the federalist origins of bankruptcy law in the United States. *See* G. Marcus Cole, *The Federalist Cost of Bankruptcy Exemption Reform*, 74 Am. Bankr. L. J. 227, 239-41 (Summer 2000).[14] Professor Cole claims that regional and demographic differences, reflected in state exemption laws, undercut the effort to enact a lasting bankruptcy law, with the North and urban centers pushing for national bankruptcy legislation, while the South and rural areas resisted, out of fear that such laws were "devices by which their citizenry might be deprived of land and liberty." *Id.* at 246. When a national bankruptcy law with some permanence was finally enacted in 1898, it included an incorporation of

---

[14] The author defines a federalist institution for purposes of his article as "one that employs a structure involving (1) vertical and horizontal separation of powers among sovereigns, and (2) at least horizontal competition between sovereigns." *Id.*, at 237. In the bankruptcy context, the author argues:

> The common feature of the way bankruptcy law has operated over the last one hundred years is its function largely as a procedural device that incorporates substantive non-bankruptcy law. Furthermore, it is an alternative, nonexclusive environment for the resolution of debtor-creditor rights. ... [M]aintenance of the federalist structure is a choice of mere policy, rather than constitutional dimensions. ... [B]y deferring to non-bankruptcy substantive law, bankruptcy preserves both the vertical and horizontal separation of powers that currently characterizes such law ... Bankruptcy ... can be viewed as federalist *to the extent that its rules are merely procedural* and directed at solving the problem of the common pool. Bankruptcy ceases to be federalist where it is comprised of rules that result in a departure from the substantive result that would inhere outside of the bankruptcy environment.

*Id.., at 239-240.

state law property rights, including state exemption laws. *Id.* at 242.[15] In so doing,  the

then new law also incorporated *de facto* regional variations in the operation of an

otherwise uniform federal bankruptcy law, creating serious constitutional questions.[16]

---

[15] Another commentator points out that it was not *until* the adoption of the 1898 Act that state law exemptions were incorporated into the federal bankruptcy law. *See* Richard E. Mendales, *Rethinking Exemptions in Bankruptcy*, 40 B.C. L.REV. 851 (July 1999). Prof. Mendales observes:

> Contrary to what many in and out of Congress appear to believe, federal bankruptcy law did not, in deference to states' rights, simply absorb this state-by-state hodgepodge of exemption laws from its inception. The first federal bankruptcy act, enacted in 1800 and then repealed in 1803, included parsimonious but purely federal exemption provisions: a debtor was entitled to keep his or her "necessary" clothing and bedding and that of his or her spouse and children. In addition, the Act borrowed from British law in providing that a bankrupt whose creditors received at least 50% of the value of their claims could receive a dividend of 5% of the value of the estate (or 10% of the value of an estate whose creditors recovered at least 75% of their claims), as a reward for cooperating with the bankruptcy commissioners. Thus, the first implementation of the Constitution's Bankruptcy Clause by Congress indicated that those who drafted and approved it did not believe that state law had any significant role to play in the bankruptcy process.
>
> …
>
> Only with the third federal bankruptcy statute, that of 1867, did state exemptions begin to creep into federal bankruptcy law. Even in this case, however, their importance was secondary and was intended to protect debtors rather than states' rights. The 1867 Act followed its predecessors in creating meager but uniform federal exemptions. It also authorized Civil War veterans to keep their uniforms and, recognizing some of the hardships created by the parsimonious federal exemptions, permitted debtors to claim state exemptions to the extent they exceeded the federal amounts. Ironically, this provision gave rise to significant objections to the law, on grounds that allowing debtors to claim sharply varying state exemptions was contrary to the constitutional mandate to create "uniform" bankruptcy laws.
>
> … It is … not surprising, amid the compromises attending [the 15 year] struggle [to pass a new bankruptcy statute], that when Congress enacted the Bankruptcy Act of 1898, it took a wrong turn on the exemption issue. The Act abandoned federal exemptions suddenly and completely by authorizing debtors to take whatever exemptions to which they were entitled under state law and no more.

*Id.*, at 855-57 .

[16] The law was in fact attacked on constitutional grounds not long after its enactment, it being claimed that this incorporation had the effect of making the law non-uniform, in derogation of the Bankruptcy Clause in the Constitution, which only authorizes Congress to enact *uniform* laws respecting bankruptcy. *See Hanover Nat. Bank v. Moyses*, 186 U.S. 181 (1902). The challenge was turned back, with the Court ruling that the Clause only required geographic, not personal, uniformity. Said the Court: "the system is, in the constitutional sense, uniform throughout the United States, when the trustee takes in each State whatever would have been available to the creditor if the bankrupt law had not been passed." *Id.,* at 190.

The question whether the bankruptcy law is or is not federalist in nature continues to be widely debated. *See, e.g.,* Randolph J. Haines, *Federalism and Bankruptcy: Deciphering Katz: Federalism Principles in Bankruptcy After Katz*, 15 AM.BANKR.INST.L.REV. 135 (Spring 2007) (arguing that, after *Katz*, the Bankruptcy Clause needs to be understood as an *expansion* of congressional power, rather than a limitation on that power, Says Judge Haines, "it is the more robust uniformity identified in *Katz*, rather than the cramped and almost meaningless uniformity applied in *Moyses*, that should inform the interpretation

The Bankruptcy Reform Act of 1978 aspired to create a uniform set of exemptions for use in bankruptcy cases, without regard to state law exemption schemes. *See* Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 AM. BANKR. INST. L. REV. 5, 33-37 (1995). However, that proposal was hotly debated.[17] Ultimately a compromise was reached, reflected in section 522 of the original 1978 Bankruptcy Code, in which a new federal exemption scheme was indeed enacted, but debtors were given the alternative of choosing their own state's exemption scheme. In addition, states were given the right to "opt out" of the federal exemption alternative, effectively limiting their residents[18] to their state's exemption scheme should they file

---

of bankruptcy statutes that do not expressly state which kind of uniformity Congress intended." *Id.*, at 140. He also notes that *Katz*

> may signify a reversal of the long-standing presumption that bankruptcy law should be construed and applied with the limits of federalism in mind, even in the absence of any express Congressional intent. This changed presumption could have a profound impact on the interpretation and application of bankruptcy law far beyond merely dealing with the affirmative defenses available to State defendants. It could affect bankruptcy jurisdiction, how bankruptcy law is interpreted (the federal common law of bankruptcy), the incorporation of or reliance on nonuniform state law, and the federalism limits that might otherwise be construed to limit the plain meaning of bankruptcy laws.

*Id.*, at 141. And on the precise issue presented in the case *sub judice*, Judge Haines offers:

> Such an application of the rationale of *Katz* is even more appropriate after the adoption of BAPCPA. The great compromise that gave rise to the uniformity challenge to the Bankruptcy Act--the ability of states to define exempt property -- was one of the principal BAPCPA reforms. The reforms did two things. First, they reduced states' homestead exemptions by imposing a federal $ 125,000 cap under certain circumstances notwithstanding state law, and eliminating the exemption altogether if the value derived from a transfer prohibited a new federal law. More importantly for present purposes, however, the reforms added several explicit references to when bankruptcy courts must apply state law, and which state law must be applied. These explicit references create the negative implication that where Congress does not mandate application of a specified state law, it intended a uniform federal rule to apply.

*Id.*, at 149-150.

[17] *See* William Houston Brown, *Political and Ethical Considerations of Exemption Limitations: The "Opt-Out" as Child of the First and Parent of the Second,* 71 AM.BANKR.L.J. 149, 160 (Spring 1997). The House Bill contained only a choice between a new federal exemption scheme and one's state exemptions, while the Senate Bill had only an incorporation of state exemption laws, as under the Act. *Id.*

[18] The court here does not purport to address the question left open by the Fifth Circuit in *Matter of Camp*, regarding whether opt-out laws could have extraterritorial effect if they are not by their own terms limited to their own residents, though the court's analysis of the extraterritorial application of state exemption laws might be relevant to the resolution of that question too. *See Matter of Camp, supra*, note 1.

bankruptcy while domiciled in that state. *Id.* 236-37. Thus, the federalist character of exemptions in bankruptcy continues in current law, for good or for ill.[19]

The 2005 amendments left the basic structure of the exemption selection process in section 522(b) essentially unchanged. Those amendments substantially altered the domiciliary rule, however, and in the process, significantly departed from the rationale for preserving state exemption schemes in the Bankruptcy Code in the first place.[20] The changes were a response to a perceived abuse by wealthy debtors (Bowie Kuhn is the paradigmatic example).**[21]** To prevent such abuse, the 2005 amendments required that, for a debtor to enjoy the benefits of the state exemptions of the state where the debtor filed her petition, she would have to have been resident in that state for *two full years,* without interruption. If she were unlucky enough to have lived anywhere else for even one day of that two year period, the new domiciliary rule forced her to use the exemption

---

[19] The court recognizes that this is far from an uncontroversial statement. Indeed, one commentator argues that the inclusion of the "opt-out" provision in the 1978 Code effectively reaffirmed the dominance of the federal government over exemption laws. *See* William T. Vukowich, *Debtors' Exemption Rights Under the Bankruptcy Reform Act of 1978*, 58 N.C. L.Rev. 769, 800-04 (1980). This court agrees that, under the Bankruptcy Clause, Congress clearly has the *power* to displace state exemption laws in a federal bankruptcy enactment, and there is nothing in the Bankruptcy Clause that *requires* a bankruptcy law to be reliant on state law, especially in the area of exemptions. *See* U.S. Const., Art. I, § 8, cl. 4; *see generally* Randolph J. Haines, *Federalism and Bankruptcy: Deciphering Katz: Federalism Principles in Bankruptcy After Katz*, 15 AM.BANKR.INST.L.REV. 135 (Spring 2007).

  The point to be made here is that Congress has, for better or worse, *chosen* a scheme that is federalist in its structure. There were clearly other options presented. And they were just as clearly rejected. Once again, it needs to be emphasized that this analysis is only *descriptive*. From a *prescriptive* perspective, this court is decidedly on the side of those who have advocated for a single, uniform federal exemption scheme that would displace state exemptions at least for purposes of federal bankruptcy administration. *See, e.g.,* Vern Countryman, *For a New Exemption Policy in Bankruptcy*, 14 RUTGERS L.REV. 678 (1960). In construing the statute that Congress has handed us, however, judges must be careful not to permit their prescriptive agendas to influence their interpretations of legislative intention, especially when that intent is made clear by the statute's plain language.

[20] *See* Cole, *supra,* at 238-39 (speaking of jurisdictional competition that promotes legislative experimentation and fosters liberty, in the sense that someone aggrieved by a given state's laws can preserve her freedom by simply moving to a different state). The 2005 amendments actually *penalize* a person for exercising this particular brand of liberty, a problem that Professor Cole seems to have anticipated (and feared).

[21] *See* Cole, *supra*, at 260 n. 177.

scheme (and the opt-out rule) of the state where she *used to* live two years earlier. By superimposing a choice of law regimen that disconnected the exemption rules from their state debtor-creditor law roots – at least for the significant number of debtors caught by this new, stricter residency requirement – the change in the rule created the odd prospect of a debtor being forced to choose an exemption regime that was no longer available to her.

Still, it cannot seriously be denied that Congress chose to incorporate state law exemption schemes, and expressed no intention, either express or implied, that those schemes would in the process become "federalized." The incorporation of state law exemption rules in section 522 is essentially federalist in origin and function, in much the same way as section 541 is federalist in the manner that it incorporates state property law, and section 502 is federalist in the manner that it incorporates state law with regard to determining the validity of claims. If the incorporation of a given state's exemption scheme into the federal Bankruptcy Code is an essentially federalist choice, as is argued by Professor Cole in his article, *The Federalist Cost of Bankruptcy Exemption Reform*, *see Cole*, *supra*, at 239-41, then a given state's exemption laws must be applied in bankruptcy consistent with how they would be applied in a non-bankruptcy context. It is common for federal courts construing state exemption schemes to rely on that state's own construction of those laws -- even to the point of certifying questions to the state's highest tribunal. *See, e.g.*, *In re Norris*, 413 F.3d 526 (5th Cir. 2005) (certifying question of whether a house boat could be claimed as exempt under Texas' homestead exemption statute); *see also Hanover Bank v. Moyses,* 186 U.S. 181, 189

(1902) (noting that Congress' decision to incorporate state exemption laws gave all creditors access to exactly what property they could have reached *outside of bankruptcy*). The reliance on state law reflected in the 1898 Act was reiterated in the amendments made by the Chandler Act in 1938. *See* 52 Stat. 847, codified at 11 U.S.C. § 24 (1938). Efforts to entirely federalize bankruptcy exemptions in the newly proposed Bankruptcy Code (expressed most forcefully in the Commission Report of 1973)[22] quickly foundered in the face of adverse political winds. *See* Bartell, *supra*, at 406. Instead, the final bill incorporated the domiciliary provision proposed in the Senate version.[23] The 2005 amendments also reflected Congress' rejection of a renewed proposal (by the National Bankruptcy Review Commission in 1997) to federalize exemptions for bankruptcy purposes. *See id.*, at 407, 407 n. 44, 45.[24]

As the Bankruptcy Code was originally drafted in 1978, the domicile rule for exemptions was the same as the venue rule for placement of the case. This meant that, in the majority of cases, a debtor's place of filing would almost always coincide with the state whose exemptions would apply under the domicile rule – the debtor would in fact

---

[22] Report of the Commission on the Bankruptcy Laws of the United States, *reprinted at* H.R. Doc. 93-137 (1973).

[23] *See* S. 2266, 95th Cong., 2d Sess., 123 CONG. REC. 36,091 (1977) (enacted). Prof. Bartell also adverts in her article to the floor comments of Senator Wallop, from Wyoming, who characterized the incorporation of this provision as "an important victory for the rights of States to determine exemptions for the debtors of their States." Bartell, *supra*, at 406, n. 39 (quoting 124 CONG. REC. 33,992 (1978) (remarks of Sen. Wallop)).

[24] The Fifth Circuit's decision in *Camp* lends further support for this view. In construing section 522(b)(2), the section which authorizes states to "opt out" of the federal exemption scheme with respect to debtors subject to that state's law, the court said that the plain language of the section "evidences Congress's intent to defer to each state's own legislative decision regarding the availability of the federal exemption." *Camp*, --- F.3d ---, No. 09-50852, slip op. at *6 (5th Cir. 2011). Indeed, the "opt out" itself is evidence of the assumption that states could *avoid* the superimposition of a federal exemption scheme by limiting "their" debtors (the quotations are to indicate that there is much to argue about regarding who are and who are not the appropriate objects of a given state's opt-out laws when the law itself says nothing about whether it is limited to that state's residents) to the same exemptions they would have were there no bankruptcy.

reside in the very state whose exemptions he could (or would have to) claim. *See* 28 U.S.C. § 1408(1) (venue proper if in the district in which the debtor resided for the greater portion of the 180 day period prior to filing); 11 U.S.C. § 522(b)(2)(A) (1978) (debtor entitled to claim the state exemptions of the state where the debtor resided for the greater portion of the 180 day period prior to filing). If the debtor lived in El Paso, Texas for the greater portion of the 180 day period, then the debtor would properly file in the Western District of Texas, where in the usual case the debtor resided, and could choose then Texas' exemptions to exempt the debtor's property, most of which would (in most cases) also be in Texas. There would almost never be a disconnect between the function of the state's exemption laws inside and outside bankruptcy.[25] In addition, if the debtor moved to a new state, and then needed to file for bankruptcy, she could in many cases delay filing until 91 days had elapsed following her relocation, thus assuring that her state law exemptions would match up with her state of residence. "Disconnects" were relatively rare.

With the 2005 amendments, the chance of a disconnect dramatically increased. However, the issue did arise on occasion prior to 2005.[26] The seeming injustice of

---

[25] There would, of course, be cases where the debtor, as of the filing date, might actually reside in the "wrong" state -- perhaps the debtor lived in Santa Theresa, New Mexico on the date of filing, where she had relocated two months earlier from El Paso. In that circumstance, her exemption scheme would be Texas, as would the proper venue for the case. Her residence, however, would be New Mexico, raising the real difficulty that her new home in Santa Theresa would not be exempt under Texas' homestead law. *See In re Peters*, 91 B.R. 401 (Bankr. W.D. Tex. 1988), citing *Wm. Cameron & Co. v. Abbott*, 258 S.W. 562, 565 (Ct. App. 1924) (a state's homestead exemption laws should apply only to the homestead property within such state).

[26] Indeed, the problem was in some ways worse for the few debtors who were "caught" in the trap of having to use the exemption laws (and opt out rule) of a state where they were no longer resident. Prior to 2005, there was no "fail safe" provision like the one now found at the end of the lettered subparagraphs in section 522(b)(3). Thus, a debtor could find herself literally with *no exemptions at all* if the state whose laws applied was an opt-out state and the debtor no longer had any property in that state that it could claim as exempt under that state's laws.

depriving a debtor in bankruptcy of any exemptions at all led some courts to try to craft a "fix." An early oft-cited case (pre-2005) attempting to devise such a fix is *Arrol v. Broach (In re Arrol)*, 170 F.3d 934 (9th Cir. 1999). The debtor there owned a home in Michigan but later moved to California (without selling the Michigan property). *Id.* at 935. In November 1996, he moved back to Michigan, but filed a chapter 7 petition in California on January 9, 1997 (California was the proper venue). *Id.* The domiciliary rule then in place corresponded with the venue rule, meaning that California law applied for exemption purposes as well. However, because the debtor did not actually *live* in California, he had no property there. The debtor tried to claim his Michigan home (where he *did* live) as exempt, using the *California* exemption statute. *Id.*

The Ninth Circuit described the domiciliary rule as a federal "choice of law" rule. *Id.* at 936. Of course, the import of this holding, on the facts of the case, is that domicile would not correspond with residence. Rather than face that conundrum head on, however, the court instead chose to construe California's exemption statute as sufficiently broad that, with a liberal construction, it could be applied to shelter real property outside California. *Id.* at 937. The court sidestepped the question whether California law was being applied to a "citizen" of California, or a "resident" of California, or the like. Instead, the court simply jumped to the conclusion that the state of *California,* in the abstract, favors debtors having a fresh start. Explained the court:

> In *Strangman v. Duke*, 140 Cal. App. 2d 185, 295 P.2d 12 (1956), the California court of appeals articulated the legislative goal of "providing a place for the family and its surviving members, where they may reside and enjoy the comforts of a home, freed from any anxiety that it may be taken from them against their will . . . ." *Id.* at 190 (internal quotations and

citations omitted). This goal exists independently from state boundary lines.

Although the facts of this case may be somewhat unique, the logic of applying the California homestead exemption to Arrol's Michigan dwelling is illustrated by the way in which California's automobile exemption is applied. As the bankruptcy court noted in its application of California Civil Procedure Code § 704.010 (West Supp. 1997), a bankruptcy debtor in California may claim as exempt $ 1,900 of equity in an automobile that is physically outside of California on the date the bankruptcy petition is filed. Although an automobile, unlike a home, is movable, the automobile exemption nonetheless reflects a concern for preserving a need for basic transportation. Similarly, the homestead exemption reflects a concern for preserving a need for basic housing. Both exemptions address concerns that transcend state boundaries.

*Id.* at 936-937. Under this rationale, California could conceivably extend its largesse to anyone who had had the good fortune of ever having lived in California for a period of time. After all, what limit is there on this logic? There is no requirement that California have any continuing interest in the debtor other than that California feels good about giving debtors a second chance. There is no requirement that domicile correspond to residence. There is no requirement that the debtor have been a "recent resident" or that the debtor have been a resident for a minimum period of time. The *ad hoc* logic of the decision on its own renders its conclusion suspect.

Moreover, what is the court to make of the real impact of the Ninth Circuit's ruling from a state law point of view? After all, the Ninth Circuit was purporting to interpret *state* law, following the precepts of *Erie Ry Co. v. Tompkins*. It was not suggesting that the California state courts were opining on the proper interpretation of the federal Bankruptcy Code. Nor was it saying that California construes its exemption law and policy depending on whether the exemptions are asserted in a bankruptcy case rather

than as a bar to the enforcement of a judgment. Yet, could the Ninth Circuit really be saying that, California has the power to assert that a given property in, say, Michigan is a California homestead, and that courts in Michigan must therefore bar Michigan collection officers from conducting a forced sale of the "homestead" in Michigan, as against creditors with judgments in Michigan? That surely cannot be the answer, for the reasons earlier set out in this decision's discussion of full faith and credit and the question of extraterritorial application of state exemption laws.[27] Yet, at the end of the day, *Arrol* relied essentially on the proposition that California *state* law, by its own terms, intends to have an extraterritorial effect, and then argued that the federal courts here would only be doing what a California state court would do if faced with the same set of facts (absent the bankruptcy overlay). *See Arrol*, 170 F.3d, at 936 ("the question we next consider is whether California law permits a debtor to claim a homestead on a residence that is located outside of California").

If California law were to control the exemption question in Michigan, it would have to be on the basis of a conflict of law (or choice of law) rule *in Michigan*.[28] Yet the Ninth

---

[27] *See* discussion *supra*.

[28] The Restatement (Second) on Conflicts of Laws in fact speaks of circumstances in which one court might conclude that the law of another jurisdiction ought to control the homestead exemption question. The Restatement provides that

> The local law of the forum determines what property of a debtor within the state is exempt from execution unless another state, by reason of such circumstances as the domicile of the creditor and the debtor within its territory, has the dominant interest in the question of exemption. In that event, the local law of the other state will be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 132 (American Law Institute 2010). The Comment to this provision explains that, while the state of the forum is normally the state with the dominant interest in the question of whether property of the debtor within the territory of the forum state should be exempt from execution, there may be situations in which some state other than the forum state is the one with the dominant interest in the exemption question. For example,

> When both the creditor and the debtor are domiciled in a state which is not the state of the forum, this state will usually be the state of dominant interest. Even when the creditor and the debtor are not domiciled in the same state, a state to which they both have

Circuit expressly disclaimed the suggestion that its ruling was premised on any state rule regarding conflicts of law (whether California's or Michigan's), noting that section 522(b)(2)(A) only incorporated a given state's *exemption* laws, and not its other laws (such as its rules on conflicts of law). *See Arrol*, 170 F.3d, at 935. What is more, if the question were to turn on any state's conflict of law rules, then it seems it would have be be Michigan's rules that would apply regarding whether Michigan would apply another state's exemption law to property within Michigan's borders.[29] The court would have had to have reject that rationale because section 522(b)(2)(A) directed the court to *California* law, not Michigan law.[30]

Yet other courts have followed *Arrol*, no doubt less for its persuasiveness and more for its generous outcome in the face of a seemingly unfair result if the domiciliary rule of section 522(b)(3)(A) (and former section 522(b)(2)(A)) is strictly applied. For example, the Eighth Circuit reached a similar conclusion with regard to Minnesota's exemption scheme, to be applied to property in Arizona. *Drenttel v. Jensen-Carter (In re Drenttel)*, 403 F.3d 611 (8th Cir. 2005). The court there reversed a lower court's

---

substantial relationships but which is not the state of the forum may be the state of dominant interest. In such situations, the local law of the state of dominant interest will be applied to determine whether any property of the debtor in the state of the forum is exempt from execution.

*Id.,* Comment. Under this rationale, the *Arrol* court could have made the case for applying California exemption law to the Michigan property, but only by reference to *Michigan*'s conflict of law rules. That would prove problematic, given that the Bankruptcy Code's domiciliary rule makes reference only to the law of the state enacting the exemption law, not to the law of the state called on to recognize or enforce that law

[29] *See* Restatement (Second) of Conflicts of Law, *supra*, at note 32.

[30] In fairness to the Ninth Circuit, the question before the court was not whether a judgment creditor with a judgment domesticated in Michigan could force the sale of the property over the exemption objection of the California debtor, but rather whether California law would control the exemption question with regard to the Michigan property in the *bankruptcy* context. Nonetheless, the court seemed to imply that its rationale was that this would be how the law would work in the non-bankruptcy context,. *Arrol*, 170 F.3d at 936.

conclusion that the debtor's Arizona property could not be claimed as exempt using Minnesota's exemption statute, based solely on its reading of *Minnesota's* exemption statute. The court took note of Minnesota's liberal reading of the exemption statute, resting on "the recognition that the state benefits from the sense of security and connection to the community nurtured in the home," and the fact that the homestead "protects the debtor's family and helps to reduce the need for state services." *Id.* at 615. It then said "these policies are furthered by providing debtors a secure home protected from creditors; the location of the home is not relevant." *Id.* [31]

The Eighth Circuit's analysis is similarly unconvincing. If the home sought to be claimed in fact qualifies as a homestead under any state's law, it is because the debtor actually *lives* in it. This debtor was obviously no longer living in Minnesota. He was living in Arizona. Minnesota gained no benefit from "ensuring the sense of security and connection to the community nurtured in ..." a home located in another state for a *former* resident of Minnesota. Nor did Minnesota stand to gain from any perceived savings from the reduction in the need for state services, given that the state that would be obligated to render such services should this debtor lose his Arizona home would not be Minnesota. It would be Arizona. The *Drenttel* court posits its conclusion on its reading of state law policy, but state law policy will not in fact support that conclusion.

It is at this point that Professor Bartell's analysis comes to the fore. She recognizes that the extraterritorial application of state exemption laws is a weak

---

[31] The court actually came close to suggesting that the general rule limiting the extraterritorial application of a state's exemption laws "might not apply with equal force in the context of a federal bankruptcy statute." *Id.,* at 613. Said the court, "traditional concerns respecting the dignity and sovereignty of other states and limiting jurisdiction to the state borders are simply inconsistent with the national effect and supremacy of federal law." *Id.,* note 1. The court took this idea no further, however, ultimately premising its ruling on its reading of *state* law, and how that state interprets its own laws. *Id.,* at 615.

argument that will not withstand rigorous analysis. *See* Bartell, at 416. So she argues

instead that the domiciliary test now set out in section 522(b)(3)(A) should be read as

the superimposition of a *federal* choice of law rule, such that (using our facts as an

example) a debtor's Texas property would be determined to be exempt using Nevada's

exemption laws, as though the property were in Nevada. *See id.*, at 417. A number of

courts have accepted this interpretation, including a judge of this court. *See In re Camp*,

396 B.R. 194, 201-203 (Bankr. W.D. Tex. 2008); *In re Garrett*, 435 B.R. 434 (Bankr.

W.D. Tex. 2010). The argument maintains that this federal choice of law rule effectively

pre-empts the residency requirements that are either implicit or explicit in most states'

exemption schemes, and thus permits that law to be lifted entirely out of context and

applied to the property of the debtor wherever it might be located on the date of the filing

of the case. *See Camp*, 396 B.R. at 198-99; *Garrett*, 435 B.R. at 449; *see also* Bartell,

*supra,* at 417. Prof. Bartell explains her theory thusly:

> [I]f Code 522(b)(3) gives state exemption laws extraterritorial effect, it does
> so as a matter of federal law. It incorporates by reference the applicable
> exemption scheme of a particular state (a state determined by the 730-
> day/180-day formula). As noted by the Sixth Circuit in *In re Stockburger*,
> concerns regarding the extraterritorial effect of state law are "misplaced."
> When state law is incorporated into 522(b), "state law [becomes] part of
> the federal statutory scheme; so it is federal law being given effect, not
> state law." [106 F.3d 402 (Table), at *2 (6th Cir. 1997)].
>
> The federal statute can be analyzed as if it were a contractual choice of
> law provision, albeit one that is not consensual on the nongovernmental
> party to the contract. Congress has power under the Bankruptcy Clause to
> preempt state exemption laws for bankruptcy cases, so its designation of
> applicable state exemption law is equally binding on the debtor and the
> states that might otherwise have an interest. However, even if Congress
> was not empowered by the Constitution to specify applicable exemption
> law, under Restatement section 187(1) a contractual choice of law should

> be honored to the extent the choice is one that could have been addressed directly in the contract. Because the Bankruptcy Clause gives Congress the power to list specific exemptions that a debtor may claim in bankruptcy, by analogy, its decision to incorporate by reference state exemptions would be equally enforceable.

*Id.* She adds later in her discussion that, in enacting the new domiciliary rule in 2005, "Congress intended to put the debtor into the same position as the debtor would have been had the debtor not made the recent move. *Congress did not intend to punish the debtor for moving by providing the debtor less favorable exemptions than the debtor would have had by staying put.*" *Id.* at 419-20. Not surprisingly, however, she offers no support for these assertions beyond a citation to Professor Cole's article (which was published a full three years before the 2005 amendments) and to the unhelpful legislative history to the 2005 amendments, which essentially parrot the language of the statute with little in the way of further elaboration. *See id.* at 419-20, n. 110-11. She gives no basis for her conclusion about Congress' intentions toward innocent debtors caught up by the strict rule of residence. Nor has this court been able to find any such evidence in the history leading up to the 2005 amendments.[32]

Professor Bartell offers little in the way of careful analysis to support what amounts to a federal pre-emption argument. In view of the strong federalist strain that is evident in the incorporation of state exemption laws into the federal bankruptcy laws, the claim to federal preemption is frankly difficult to swallow. The Tenth Circuit's Bankruptcy Appellate Panel has expressed the same skepticism. *See In re Stephens*, 402 B.R. 1, 5 (B.A.P 10th Cir. 2009) ("it appears to this Court that Congress was not seeking to

---

[32] *See* Susan Jensen, *A Legislative History of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 AM. BANKR. L.J. 485 (2005).

exercise any preemption right by § 522(b)(3)(A), which expressly allows states to opt out of the federal exemption system and impose their own exemptions within the bankruptcy context"). Nor does the preemption argument square with the Supreme Court's observation in *Butner* that, "unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979).

Under the Supremacy Clause of the U.S. Constitution federal law may preempt state law in one of three ways: "First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).  Second, "[i]n the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Id.* And finally, '[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Id.*

Here, section 522 does not expressly pre-empt state exemption laws. To the contrary it specifically incorporates those laws.

> "There can be no preemption … where Congress 'expressly and concurrently authorizes' state legislation on the subject. *Rhodes v. Stewart*, 705 F.2d 159, 163 (6th Cir. 1983). 'In such instance, rather than preempting the area, Congress expressly authorizes the states to 'preempt' the federal legislation.' *Id.*

*Sheehan v. Peveich*, 574 F.3d 248, 252 (4th Cir. 2009), *cert. den.* 130 S.Ct. 1066 (2010) (authorizing West Virginia to enact bankruptcy-specific state exemptions). Thus, express pre-emption does not exist here. As for implied field pre-emption, such pre-emption "will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id*. This argument too is difficult to make with respect to section 522. That section's incorporation of state exemption laws reflects a solicitude on the part of Congress in favor of the strong interests states have in balancing the interests of debtors and creditors within their state, it being state law that controls creditor enforcement remedies (and the limitations thereon).[33] Nor does conflict pre-emption exist here. "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility.'" *Id*. Section 522(b)(3)(A) can, as has been noted, result in the possibility that a given debtor *in bankruptcy* might be deprived of any exemption. The failsafe provision at the end of section 522(b)(3), however, prevents that from occurring, by providing to debtors who are deprived of any exemption by virtue of the domiciliary rule the right to claim the federal exemptions, notwithstanding any state opt-out law. *See* 11 U.S.C. § 522(b)(3). In short, pre-emption analysis demonstrates that, if anything, section 522(b)(3)(A) does *not* pre-empt state law.[34]

---

[33] *See, e.g., McGarry v. Chew (In re Chew)*, 496 F.3d 11, 14-15 (1st Cir. 2007) (overruling an objection to a debtor's homestead exemption, because a state court had already ruled that the objection was unfounded under state law prior to the bankruptcy filing); *In re Zibman*, 268 F.3d 298, 302 (5thCir. 2001) (exemptions claimed are determined by the facts and law as they exist on the date of filing); *see also White v. Stump*, 266 U.S. 310, 312 (1924) (Bankruptcy Act of 1898 made the state laws existing when the petition was filed the measure of the right to exemptions).

[34] The court in *In re Garrett* argues that conflict pre-emption does apply, based primarily on its reading of the legislative history and underlying policy. The argument from legislative history is less than persuasive, however, as the only support for the position urged by the *Garrett* court is to be found in the dissenting

This court is not alone in greeting the pre-emption argument with skepticism. *See In re Stephens*, 402 B.R. 1, 5 (B.A.P. 10th Cir. 2009) ("it appears to this Court that Congress was not seeking to exercise any preemption right by § 522(b)(3)(A), which expressly allows states to opt out of the federal exemption scheme and impose their own exemptions within the bankruptcy context"). As has already been noted, the Code in many places relies on state law to supply the rule of decision, and "unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979). The only "federal interest" one could identify here is one that affords debtors in bankruptcy with the opportunity to claim *some* property as exempt, in service to the fresh start policy of the Code. *Henderson v. Belknap (Matter of Henderson)*, 18 F.3d 1305, 1311 (5th Cir. 1994) (use of section 522(f) to remove a judgment lien that clouded the title of debtor's homestead was appropriate to assure the debtor's fresh start). There is no need to manufacture a

---

report filed by a minority of the members of the House Judiciary Committee. The argument from the court's reading of "underlying policy" is difficult to accept as well. The court says that extraterritorial restrictions in states' exemption and opt-out laws must be disregarded because, to do otherwise would mean that mobile debtors could actually get the very federal exemptions that the Code's recognition of state opt-out law says such debtors are not supposed to be able to have. "The point here is ... that the federal exemptions must apply and their application is inconsistent with the Congressional policy of placing debtors who move within 730 days of their bankruptcy filing in the same position they would have been in had they never left their prior state of domicile." *Garrett*, 435 B.R., at 450 n. 21. But that statement of purported Congressional public policy has only the support of authors of the minority report. The majority position was to the effect that the 730 day residency requirement would prevent the unscrupulous debtor from enjoying the benefits of the exemption scheme in the state *to which he had moved*.

> The bill also restricts the so-called "mansion loophole." Under current bankruptcy law, debtors living in certain states can shield from their creditors virtually all of the equity in their homes. In light of this, some debtors actually relocate to these states just to take advantage of their "mansion loophole" laws. S. 256 closes this loophole for abuse by requiring a debtor to be a domiciliary in the state for at least two years before he or she can claim that state's homestead exemption.

H.REP. NO. 31, 109th Cong, 1st Sess 15-16 (Apr. 8, 2005). There is no discussion in the majority report about the importance of "placing debtors in the same position as they would have been in had they never left their prior state of domicile."

"federal interest" in assuring a debtor in bankruptcy access to *some* property as exempt as a device to re-interpret the plain language of section 522(b)(3)(A), as the failsafe clause at the conclusion of section 522(b)(3) already accomplishes that result.

The express language of section 522(b)(3)(A) certainly generates a result that many (including this court) would perceive to be unfair. But a perceived unfair result is not necessarily an absurd result. And absent such a finding, a court is obligated to apply the plain language of the statute as written. The language of the domiciliary requirement is, to this court, unambiguous and straightforward. Though the look-back period has changed, the structure of the provision is essentially unaltered from the original version enacted in 1978, and it is plainly and easily applied (albeit with unfortunate consequences in the case of traveling debtors). If the language of a statute is plain, then it is the duty of the court to enforce them according to their terms. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 634 (2004); *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("courts are to presume that a legislature says in a statute what it means and means in a statute what it says").

The domiciliary requirement is linked to section 522(b)(1), which gives debtors the option to select for exemption from property of the estate "the property listed in either paragraph (2) or, in the alternative, paragraph (3) of [section 522(b)]." 11 U.S.C. § 522(b)(1). Subparagraph (2), which refers to the federal exemption list found in section 522(d), provides that the debtor, pursuant to the law applicable as determined by the domiciliary requirement, may elect the federal exemptions, subject to any state opt-out provision. Subparagraph (3) refers to the state exemptions under the state law

30

exemption scheme applicable to the debtor, which is also determined by the domiciliary requirement. The domiciliary requirement itself is set out in subsection (b)(3), and begins "Property listed in this paragraph *is* ..." 11 U.S.C. § 522(b)(3).[35] The verb chosen is significant. We are not told that the property is *to be determined by*, or *pursuant to*, a choice of law rule then set out in the statutory text. We are told instead that the property of the estate that can be exempted *is* whatever the domiciliary test says it is. *See Texas Food Indus. Assoc. v. United States Dep't of Agric.*, 81 F.3d 578, 582 (5th Cir. 1996) (applying the "cardinal canon of statutory construction--that the words of a statute will be given their plain meaning absent ambiguity"—and concluding that the plain language of the statute at issue precluded the defendant's argument).

Subparagraph (A) then tells us, in pertinent part, that the property that qualifies for the alternatives in section 522(b)(1) *is* "any property that *is* exempt under ... State or local law that *is* applicable on the date of the filing of the petition ..." 11 U.S.C. § 522(b)(3)(A). Again, the verb choice is important. We are not told that the property that can be chosen *would be* exempt under the applicable state law to be selected under the look-back test. We are told instead that, *as of the filing date*, the property to be selected is that which *is* exempt under the State law regime dictated by the domiciliary test. That language is clear and straightforward, and admits of no ambiguity. Find the right law.

---

[35] The pre-2005 version set out the choice option in the main paragraph, subsection (b). That paragraph ended with the phrase "Such property is ..." It then set out two subparagraphs, (1) and (2). Subparagraph (1) laid out the federal exemption option, pointing to section 522(d), but made that option subject to the opt-out law of whatever state was indicated by the domiciliary requirement, then set out in subparagraph (2)(A). Former subparagraph (2)(A) is now subparagraph (3)(A), and is altered primarily to replace the 180-day look-back period with the 730-day look-back period. There is no substantive difference between the phrase "Such property is ..." in the pre-2005 version, and the phrase "Property listed in this paragraph is ..." in the 2005 version.

Then apply that law, as of the date of the filing of the petition, and ask whether the property the debtor wants to claim *is exempt* under that law.

The actual test itself starts with the phrase "... at the place," but to put it in context, it is best to start by restating earlier language: "Property listed in [section 522(b)(3), being the "second alternative" described in subsection (b)(1)] is ... any property ... that is exempt under ... State or local law that is applicable ... *at the place in which the debtor's domicile has been located* for the 730 days immediately preceding the date of the filing of the petition ..." 11 U.S.C. § 522(b)(3)(A) (emphasis added). Thus, the general test for state selection is the state where the debtor resides as of the date of the filing of the petition, *provided the debtor has lived there continuously for the two year period prior to filing*. Again, this is a straightforward test, easily applied, and, far from creating ambiguity, correctly matches the state of the debtor's current residence with the state whose exemption laws should apply to the debtor for those debtors who have lived in the same place for at least the last couple of years (and that is most debtors). The debtor's exemptions (under the state option) in bankruptcy will exactly correspond with the debtor's exemption entitlement outside bankruptcy.

The next part of the test is designed to deal with the perceived problem of debtors who move opportunistically to a state with generous exemptions (or a state that permits the debtor to choose federal exemptions). Before 2005, the test corresponded with the venue test, so that a debtor who moved to a favorable state within, say, a month of filing would face the prospect of having her case dismissed or transferred, on grounds that the case was improperly venued. *See* FED. R. BANKR. P. 1014(a)(2); 28

32

U.S.C. § 1472. Thus (at least theoretically), debtors trying to play the system would find their efforts frustrated, and so would be forced to return to the place from whence they came, there to face the consequences of their perfidy.[36] To avoid this, a debtor needed only to hold on for 91 days before filing the petition in the new location. Then, again, the state of the debtor's current residence would match up with both the rule for proper venue and the state whose exemption laws would apply.

The 2005 amendments did not change this basic structure. However, with the two year residency rule in place, the venue rule for placing the case could easily be different than the residency rule for exemption law purposes, because the time periods for venue and for exemption domicile no longer match. If the peripatetic debtor could not hold out for two years before filing in her new residence, then the same 180 look-back test would be used – but as of the date *two years before* the date of the bankruptcy filing. The exact language in the statute states: " ... or if the debtor's domicile has not been located at a single State for such 730-day period, the place in which the debtor's domicile was located for 180 days immediately preceding the 730-day period or for a longer portion of such 180-day period than in any other place." 11 U.S.C. § 522(b)(3)(A). Once again, the language of the test is clear. The consequences can be draconian, and in many cases the result will be that the place of the debtor's residence will no longer match up with the state exemption laws that the domiciliary test imposes. But the operation of the statute is not ambiguous. Once the "correct" state is identified using this

---

[36]  The consequences consisting of (1) having now to travel to the former location for meetings and hearings, and (2) having not only to settle for the exemption scheme in the former location, but also to face the real possibility that most of their current property, now located in their current state, would not be eligible for exemption under the law of the former location.

test, we still ask the same question. *Is* the debtor's selected property exempt under *that* state's laws?

Perhaps, in a more perfect world, Congress could have enacted Professor Bartell's suggested test. One could imagine statutory language that would have yielded that result -- language, it is worth adding, that would also be more likely to trigger federal pre-emption than does the current text. For example, section 522(b)(3)(A) could have been written thusly (in pertinent part): "Property listed in this paragraph is ... any property that *is* exempt under ... State or local law on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition, or if the debtor's domicile has not been located in a single State for such period, *then any property (regardless of its location as of the date of the commencement of the case) that would be exempt if said property were located in or subject to the State or local law* at the place in which the debtor's domicile was located for 180 days immediately preceding the 730 day period *..."* That sort of language would signal that Congress intended the "as if" approach laid out in *Camp*, for example.[37]

---

[37] In *Camp*, the court argues that section 522(b)(3)(A)

> requires the bankruptcy court to 'disregard the element of reality' of the *actual* state of the debtor's residence (Louisiana) ... and instead engage in the fiction of considering the state of his or her former residence (Texas) ... to be the state where he or she currently resides. If the debtor chooses state exemption laws, Texas exemption laws would apply to the debtor's home and other property located within the state -- in this case, within "Louisiana *qua* Texas." This is *not,* however, the extraterritorial application of Texas' exemption laws. It is not under the authority of the State of Texas that its exemption laws are being applied to property outside Texas. Rather, it is a *federal* choice of law statute -- § 522(b)(3)(A) -- that has expressly provided that the exemption laws of a particular state -- Texas -- are applicable to a debtor who, by definition, is no longer a domiciliary of that state and so whose property is almost certainly no longer located within that state.

*In re Camp*, 396 B.R. 194, 201-02 (Bankr. W.D. Tex. 2008) (Gargotta, J.). Were the language of the statute to read as is suggested in the text above, this interpretation might work. However, so long as the

The actual language of the current statute, however, signals no such approach, nor does it express any intent to artificially apply one state's laws to property in another state. If anything, the unnumbered paragraph at the end of section 522(b)(3) (immediately following subparagraph (b)(3)(C)) evidences a Congressional recognition that the straightforward application of the statutory language, as written, could very well have the very result that the courts in *Camp* and *Garrett* try so assiduously to avoid -- a debtor could well be left with no property eligible for exemption because of the mismatch between the debtor's state of current residence as of the date of filing, and the state whose exemption laws must be applied as of that date. States that paragraph:

> If the effect of the domiciliary requirement under subparagraph (A) is to render the debtor ineligible for any exemption, the debtor may elect to exempt property that is specified under subsection (d).

11 U.S.C. § 522(b)(3), at unnumbered text following subparagraph (C). This paragraph has the positive effect of overriding a state's opt-out provision in the very circumstance presented by the facts of this case. The debtor lives in Texas, and has a home here. The domiciliary requirement in section 522(b)(3)(A) forces the debtor to use Nevada's exemption scheme. Nevada law also prohibits its debtors from selecting the federal exemption scheme when they file for bankruptcy. As the opt-out provision in Nevada law

---

operative verb in the statute is in the *indicative* mood and not the *subjunctive* mood, this invitation to ignore reality simply must be rejected. Nor does the court believe that the Supreme Court's ruling in *Owen v. Owen* supports a contrary view. *See* 500 U.S. 305, 312-13 (1991). Nothing in that decision can be read as a departure from that Court's long adherence to the application of the plain meaning rule as the first rule of statutory construction in bankruptcy matters. The case *can* be read as supportive of federal pre-emption principles, but the statute there under consideration (section 522(f)) was an *express* pre-emption of state lien law statutes. *See also United States v. Security Industrial Bank*, 459 U.S. 70 (1982). Section 522(b), by contrast, is an express *incorporation* of state law into the federal bankruptcy law. That that incorporation may be to further a particular federal purpose does not convert that incorporation into a pre-emption of state law, as *Camp* tries to argue. What is more, section 522(f) in fact *does* use the subjunctive mood, requiring a court to apply an "as if" test, as the Court in *Owen* noted. *See* 500 U.S. at 310-311. Section 522(b), as we have noted, does not use the subjunctive "would be." It uses the indicative "is."

is effective against this Texas debtor,[38] this debtor could easily find himself with no exemptions at all. Nevada's homestead law does not have extraterritorial effect,[39] and its remaining provisions are enacted for the benefit of those who might find themselves the subject of collection enforcement by a Nevada sheriff or the like. They were never intended to apply as a limitation on the enforcement actions of a peace officer in, say, Texas. If this court is right that Nevada's exemption laws do not have extraterritorial application, and if this court is also right that Nevada's exemption laws cannot be lifted out of context and applied to a nonresident's property (especially property not in Nevada) -- and based on the plain meaning of section 522(b)(3)(A), the court is confident that it is right -- then the debtor would in fact be rendered ineligible for any exemption, the very scenario contemplated by the language at the end of section 522(b)(3).

The court readily agrees with the observation that section 522(b) as now written does not work well. That is an insufficient basis to substitute one's own preferred reading for that indicated by the plain language chosen by Congress. Clearly, Congress has failed to anticipate the stark inconsistency between a deference to state law, on the one hand, and a harsh domicile rule designed to punish a few ne'er-do-wells on the other. What is more, Congress appears to have given no thought whatsoever to the real damage its new residency requirement imposes on today's debtors. Long in our country's past, debtors did not move around nearly so much as they do today. Congress could, in the past, indulge the presumption that a given debtor filing for bankruptcy

---

[38] *Matter of Camp*, --- F.3d ---, No. 09-50852 (5th Cir. Jan.21, 2011).

[39] *See* Bartell, *supra*, at 423. On this point, both this court and the *Camp* court agree.

09-32896-hcm  Doc#33  Filed 01/26/11  Entered 01/26/11 16:54:49  Main Document  Pg 37 of 42

would do so, with very few exceptions, in the state that was also his residence, for

purposes of applying exemption laws in the bankruptcy case. In 1902, the Supreme

Court in *Moyses* observed that

> It was many times ruled that this provision [*i.e.*, Section 6 of the Bankruptcy Act of 1898, allowing to bankrupts the exemptions which are prescribed by the state laws in which the debtor had their domicile for the greater portion of six months prior to filing] was not in derogation of the limitation of uniformity because *all contracts were made with reference to existing laws, and no creditor could recover more from his debtor than the unexempted part of his assets*. Mr. Justice Miller concurred in an opinion to that effect in the Case of Beckerford, 1 Dill. 45, Fed. Cas. No. 1,209.
>
> Mr. Chief Justice Waite expressed the same opinion in Re Deckert, 2 Hughes, 183, Fed. Cas. No. 3,728. The Chief Justice there said: 'The power to except from the operation of the law property liable to execution under the exemption laws of the several states, as they were actually enforced, was at one time questioned, upon the ground that it was a violation of the constitutional requirement of uniformity, but it has thus far been sustained, for the reason that it was made a rule of the law to subject to the payment of debts under its operation *only such property as could by judicial process be made available for the same purpose. This is not unjust, as every debt is contracted with reference to the rights of the parties thereto under existing exemption laws, and no creditor can reasonably complain if he gets his full share of all that the law, for the time being, places at the disposal of creditors.* One of the effects of a bankrupt law is that of a general execution issued in favor of all the creditors of the bankrupt, reaching all his property subject to levy, and applying it to the payment of all his debts according to their respective priorities. *It is quite proper, therefore, to confine its operation to such property as other legal process could reach.* A rule which operates to this effect throughout the United States is uniform within the meaning of that term, as used in the Constitution.'

*Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 189-90 (1902) (emphasis added). One

can recognize from the emphasized portion of the text the court's assumption that the

average debtor was assumed to be one whose exemptions in bankruptcy would

correspond with the exemptions that that debtor could claim in the face of collection

actions outside bankruptcy. Indeed, there is even the assumption that those exemption laws would correspond with the exemptions that were in place *when the credit was first extended* (which could have been years earlier).

The basic language used to fix the domicile of the debtor for purposes of exemption selection in bankruptcy remains basically unchanged from that first used in 1898. Section 6 of the Bankruptcy Act of 1898 provided: "This act shall not affect the allowance to bankrupts of the exemptions which are prescribed by the state laws in force at the time of the filing of the petition *in the state wherein they have had their domicil for the six months, or the greater portion thereof, immediately preceding the filing of the petition.*" Bankruptcy Act of 1898, ch. 541, § 6, 30 Stat. 544 (repealed 1978) (emphasis added). Eighty years later, the 1978 statute provided that debtors could exempt (unless otherwise barred by state law) "any property that is exempt under ... State or local law that is applicable on the date of the filing of the petition *at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180 day period that in any other place.*" 11 U.S.C. § 522(b)(2)(A) (1978). Twenty-seven years after that, the 2005 amendments dramatically extended the potential look-back period, trapping the traveling debtor in the unfortunate conundrum that has been discussed in this opinion. Yet the basic structure for making the domicile call was unchanged from more than a century before.

Meanwhile, the American populace has become far more mobile. Professor Bartell observed in her article that, according to U.S. Census data from the 2000

census, more than 14 million Americans move every year, with over 2.6 million relocating to a different state. Bartell, *supra*, at 401.[40] While the bankruptcy laws have always made provision for the possibility that someone who files might only have recently moved to that state (and have similarly always matched the venue provisions to the exemption domicile rule), it was only in 2005 that Congress first completely disconnected the domicile rule from reality. Professor Bartell (as well as the courts in *Camp* and *Garrett*) seek to fix this problem with a suggestion to read the domicile rule as a federal choice of law proviso, one that would permit the statute to work justly even for the peripatetic debtor. Bartell, *supra*, at 418-19; *In re Camp*, 396 B.R. at 198; *In re Garrett*, 435 B.R. at 439. But the fix is actually a reach. The statute cannot be tortured into saying what it does not say. The simple reality is that Congress did not think through all of the implications -- or worse, did not care about the implications. The 2005 amendments were designed to penalize persons trying to use state exemption laws (and the Bankruptcy Code's use of those laws) opportunistically. *See* Cole, *supra*, at 260. Unfortunately, in the process, those same amendments inflict a penalty on innocent people with no intention whatsoever of gaming the system. They are just people who happen to have moved, and whose financial situation is such that they cannot wait two years to file (recall that, under prior law, the debtor needed only to hold out for 91 days). Many of those people are people like this debtor -- who moved to

---

[40] 2010 census data analysis is not yet complete. However, a 2009 report reflected that 37 million Americans had moved between 2008 and 2009, 1.3 million to different states. *See* Geographical Mobility: 2008 to 2009, Detailed Tables, Table 1 (General Mobility, by Race and Hispanic Origin, Region, Sex, Age, Relationship to Householder, Educational Attainment, Marital Status, Nativity, Tenure, and Poverty Status: 2009 to 2009), available at http://www.census.gov/population/www/socdemo/migrate/cps2009.html (visited Jan. 7, 2011).

another state only to find a job, and who returned home when his employment situation allowed it. He is effectively punished for no crime worse than looking for a job.[41]

The only thought that Congress gave to the thousands of unsuspecting debtors who might be ensnared in a trap designed to catch only ne'er-do-wells was the addition of the fail-safe mechanism at the end of section 522(b)(3) – and that might not have happened at all but for the intervention of a legislative affairs liaison at the Department of Justice. *See* Letter to Representative Henry Hyde from Dennis K. Burke, Office of Legis. Affairs, Dept. of Justice (April 19, 1999), *reprinted at* H.R. Rep. No. 106-123, pt. 1, at 201 (1999).[42] Language responsive to the concerns he raised was included in the version of H.R. 333 that emerged from conference in 2002. *See* H. Rep. No. 107-617, Conference Report to Accompany H.R. 333, Bankruptcy Abuse Prevention and Consumer Protection Act of 2002, at 58-59 (July 25, 2002). The Conference Report explained that "if the effect of [the new 730 day domiciliary rule] is to render the debtor ineligible for any exemption, the debtor may elect to exempt property of the kind

---

[41] For reasons already explained in this court's earlier decision in *Battle*, section 522(b)(2) also does not work properly, primarily because Congress did not think through the implications of its provision. Section 522(b)(2) uses the domiciliary test in section 522(b)(3)(A) to select which state's law to apply for purposes of testing whether the debtor will be barred from choosing the federal exemptions. There seems to be little doubt, from the language found in the failsafe provision at the end of subparagraph (b)(3), that Congress assumed that if the state chosen by the domiciliary requirement had an opt-out provision, then that provision would bar the debtor from choosing federal exemptions, even though the state so chosen happens not to be the state where the debtor is residing on the date of the filing. Section 522(b)(2) states that the choice is available to a debtor "unless the State law that is applicable to the debtor under paragraph (3)(A) specifically does not so authorize." If the given state's law turns out not to bar the debtor from making the choice based solely on the fact that the state law itself applies only to its own residents, then, for debtors subject to that state's law, the failsafe provision in section 522(b)(3) is unnecessary surplusage. *See Matter of Camp*, --- F.3d ---, No. 09-50852 (5th Cir. Jan. 21, 2011).

[42] Mr. Burke pointed out that the proposed domiciliary requirement of 730 days might not be "effective," saying "Much of this will depend on how states limit their exemptions or permit individuals to claim exemptions. Without a full understanding of how state exemption laws are applied, unintended gaps will still arise under this proposal as debtors attempt to claim exemptions under the laws of another state in which they no longer reside or have property. It is unlikely, for example, that a Missouri debtor could claim the Texas homestead for the debtor's new Missouri residence -- two years after the debtor has moved himself and his property from Texas -- leaving the debtor with no homestead exemption to claim." *Id.*

described in the federal exemption *notwithstanding state opt out.*" *Id.* at 211 (emphasis added). That language is directly responsive to the issue raised to Representative Hyde by Dennis Burke in his letter three years earlier. It remained in subsequent iterations of the legislation through its eventual adoption in 2005. *See* H.R. 975, 108th Cong, 1st Sess (2003); S. 256, 109th Cong, 1st Sess (2005); *see generally* Susan Jensen, *A Legislative History of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 AM. BANKR. L. J. 485 (2005).

It seems clear that the plain language of the statute yields an unfortunate result. Here, it deprives this debtor of his home, even though outside of bankruptcy, Texas law would preserve his home against the claims of his creditors. Yet an unfortunate result is not sufficient grounds to ignore the plain language of a statute. It is certainly never grounds to simply ignore Congressional intent, nor does it ever justify simply rewriting a statute a particular judge or judicial panel does not like. And that principle of judicial restraint must cut across all ideological lines, as it is central to the nature of the judiciary's role in a constitutional form of government. *See Marbury v. Madison*, 5 U.S. 137 (1803). This statute plainly directs a court to deprive the unlucky debtor who has moved to the state of filing within the two year period prior to filing of the state exemptions not only of the state in which she resides but also of the state in which she used to reside, and gives her, in return, the right to claim federal exemptions (whether on the basis this court espoused in *Battle* or on the basis of the failsafe provision at the end of section 522(b)(3)). The result, in this case, is that the debtor will lose his house.

The court takes no pleasure in being the enforcing officer of a wrongheaded and plainly unfair statute. But it is up to Congress, not the courts, to fix this problem.

## Conclusion

For the reasons stated, the court concludes that this debtor cannot claim the Texas exemption scheme to exempt his Texas homestead from the estate. Nor can the debtor use Nevada law to shelter his homestead in Texas. The debtor is limited to claiming the federal exemptions. A form of order will be separately entered, consistent with this decision.

**# # #**